Opinión concurrente y disidente emitida por la
Jueza Asociada Señora Fiol Matta.
En este recurso se hace necesario interpretar la Ley de Muelles y Puertos de Puerto Rico de 1968, infra, una ley anticuada, desfasada y elaborada para aplicarse , en otro contexto social, económico, temporal y geográfico, totalmente ajeno a nuestras realidades físicas, jurídicas y sociales. Ello nos impone la obligación, como adjudicadores, de utilizar los instrumentos que nos ofrece el ordenamiento para interpretar el texto de manera que propenda a la protección del bien común. Ese es, a fin de cuentas, y por definición, el propósito de toda legislación.
*460 La primera definición de la zona marítimo-terrestre con posterioridad a la Constitución del Estado Libre Asociado de Puerto Rico, surge de la Ley de Muelles y Puertos de Puerto Rico de 1968 (Ley de Muelles y Puertos de 1968), Ley Núm. 151 de 28 de junio de 1968 (23 L.P.R.A. see. 2101 et seq.). A su vez, la definición que allí se recoge es una reproducción directa de la Ley de Puertos española, hecha extensiva a Puerto Rico por decreto real en 1886, es decir, a finales del siglo XIX. La Exposición de Motivos de la Ley de Muelles y Puertos de 1968 nos ilustra que el propósito primordial de esta ley no es la protección de las costas ni la seguridad pública, sino asegurar el tráfico marítimo en interés del comercio y la administración de las aguas nave-gables, los muelles y las zonas portuarias. Además, al revisar los poderes generales de la Autoridad de los Puertos sobre las aguas y zonas portuarias y la facultad de delimitar aquella parte de la zona marítimo-terrestre que deba formar parte de la zona portuaria, notamos que tampoco denota interés en la conservación de las playas ni asigna valor alguno a la seguridad pública.(1) 23 L.P.R.A. secs. 2202 y 2601.
La creación del Departamento de Recursos Naturales y Ambientales (DRNA) y la transferencia a éste de las facultades de delimitar y proteger la zona marítimo-terrestre, entre otras, dio un giro importante a la aplicación de la Ley de Muelles y Puertos pues evidenció el compromiso del Estado con el cumplimiento del mandato constitucional de procurar la más eficaz conservación de nuestros recursos naturales. Además, como bien señala la mayoría, la Ley sobre Política Pública Ambiental, la cual pauta con más especificidad en qué consiste este mandato constitucional, requiere de toda instrumentalidad del Estado, “al máximo *461 grado posible, interpretar, aplicar y administrar todas las leyes y cuerpos reglamentarios vigentes y los que en [el] futuro se aprueben en estricta conformidad con la política pública enunciada Art. 4 de la Ley Núm. 416 de 22 de septiembre de 2004 (12 L.P.R.A. sec. 8001a(b)).
Estoy completamente de acuerdo con la Opinión del Tribunal en cuanto afirma que la interpretación que se haga de la definición anticuada de zona marítimo-terrestre debe ser cónsona con nuestra política ambiental de rango constitucional, la cual procura la conservación y preservación de las costas y la sustentabilidad de nuestro ambiente natural y urbano. Por ende, estoy conforme con el análisis hermenéutico que utiliza la mayoría para validar la consideración de nuevos criterios incorporados en el reglamento del DRNA—los cuales están ausentes en la Ley de Muelles y Puertos— para recontextualizar la ley conforme la nueva importancia que se le otorga a la conservación de la zona marítimo-terrestre.
Sin embargo, los mismos fundamentos que permiten a la mayoría interpretar la ley y el reglamento con miras a validar el uso de factores que la ley específicamente no contempla para delimitar la zona marítimo-terrestre, sirven de autoridad para dar una lectura distinta a la ley, más a tono con las necesidades de conservación y seguridad pública. Desde esta óptica, concluyo que el Secretario del DRNA no está obligado a utilizar, en todo caso, el llamado “criterio dual” al que se aferra la mayoría. En cuanto a este aspecto de la Opinión del Tribunal, disiento.
La interpretación de la mayoría limita la facultad del Secretario del DRNA de ejercer sus funciones de acuerdo con su peritaje al hacer un deslinde. Con ello obvia, primeramente, que la manera en que debe realizarse un deslinde no surge de la ley, sino de la facultad delegada al Secretario del DRNA—por su conocimiento especializado— de llevar a cabo una tarea de naturaleza extremadamente técnica.
*462 La información que el agrimensor del DRNA debe considerar al momento de hacer un deslinde se encuentra en el artículo 3(3.2) del reglamento del DRNA, el cual, en particular, dispone que
... el Departamento podrá hacer uso o requerir el uso de estudios, planos, mapas, fotos, modelos de computadoras y documentos sobre la zona marítimo-terrestre o el movimiento de las olas[, o] marejadas en las costas de Puerto Rico preparados por agencias e intrumentalidades gubernamentales locales y federales, tales como, pero sin limitarse a, el Departamento de Transportación y Obras Públicas, la Administración federal de Manejo de Emergencia (“FEMA”, por sus siglas en inglés), el U.S. Geological Survey (U.S.G.S.), el Negociado de Meteorología y otros. (Énfasis suplido.) Reglamento para el Aprovechamiento, Vigilancia, Conservación y Administración bajo éstas y la Zona Marítimo-Terrestre, Reglamento Núm. 4860 de 30 de diciembre de 1992, Departamento de Recursos Naturales (Reglamento 4860), págs. 28-29.
Este artículo permite el uso de modelajes de olas y marejadas para medir la zona marítimo-terrestre sin hacer distinción entre las costas sensibles a las mareas y aquellas que no lo sean.
La disposición reglamentaria siguiente, que se cita en la opinión del Tribunal, es la que la mayoría interpreta para concluir que el reglamento establece el criterio dual. No obstante, mi apreciación de dicho articulado es otra, basada en la lógica más que en el análisis textual.
En primer lugar, no podemos pasar por alto que al referirse a la distinción entre las áreas sensibles a mareas y las que no lo son, el Reglamento 4860 utiliza un lenguaje directivo, no mandatorio y ciertamente no excluyente de las facultades periciales del Secretario del DRNA, según dispone el párrafo introductorio del inciso (3.3):
Además de la información, documentos y factores indicados en la sección anterior, al efectuar un deslinde se podrá tomar en consideración lo siguiente .... (Énfasis nuestro.)
Tomando en consideración lo anterior, me parece evi *463 dente que los criterios científicos para identificar el límite tierra adentro de la zona marítimo-terrestre se mencionan como aplicables a las costas sensibles a las mareas porque es en esas costas que se pueden apreciar los rasgos geográficos y topográficos señalados.(2) Por otro lado, el reglamento no excluye expresamente la aplicación de los elementos topográficos y geográficos para llevar a cabo un deslinde en los lugares que no son sensibles a las mareas. Más bien, se destaca el método de deslindar la zona marítimo-terrestre en estos lugares utilizando el criterio de “las mayores olas en los temporales” por la misma razón científica, es decir, porque probablemente en estos lugares no podrá percibirse por los sentidos ningún rasgo geográfico o topográfico que indique hasta dónde se extiende el terreno que se debe proteger. Por eso el reglamento se refiere a modelaje matemático y estudios de computadora.
Toda vez que el deslinde no es urna declaración sobre los derechos al terreno, sino una operación que sirve para describir la realidad física de la costa, la discreción de la agencia para hacer un deslinde —guiada por el fin de proteger la costa y las comunidades costeras— no se debe coartar. De nuevo, la mayoría utiliza este razonamiento para avalar el uso de los criterios topográficos y geográficos para hacer un deslinde, sin distinciones por la sensibilidad del área a las mareas, pero se niega a reconocer el efecto contrario a este razonamiento de la aplicación mecánica del criterio dual.
Este criterio dual, que la opinión del Tribunal explica en detalle, se incorporó a la Ley de Aguas española en 1866 y se hizo extensivo a Puerto Rico ese mismo año. Luego, según explicamos, se incorporó a la Ley de Muelles y Puertos de 1968.(3) En ninguna de esas ocasiones se hizo estudio *464 científico alguno para adecuar la disposición española a nuestra realidad física. No obstante, los estudios científicos sostienen que hay una diferencia crucial entre las costas españolas y las nuestras.
España tiene dos tipos claramente distinguibles de costas. Geográficamente, las costas españolas se dividen entre las del Mediterráneo, donde apenas son sensibles las mareas, y las del Atlántico. C. Horgué Baena, El deslinde de costas, Madrid, Ed. Tecnos, 1995, pág. 186. En las costas españolas del Atlántico las mareas alcanzan hasta cinco metros y la zona costanera es, por lo tanto, claramente “sensible” a las mareas. Mientras, en las costas mediterráneas el movimiento usual de las mareas oscila entre cincuenta centímetros y dos metros, por lo cual se clasifican como micromareas (microtidal).(4) Sin embargo, en invierno ocurren “temporales” en estas costas.(5) D. López Feliciano, Análisis de la definición de “zona marítimo terrestre” en Puerto Rico: Hacia una nueva definición, 42 Rev. Jur. U.I.P.R. 451, 477 (2008). Los dos criterios de la Ley de Aguas española respondieron a esta realidad física.(6) Son interesantes, en este sentido, las sentencias del Tribunal Supremo español que se refieren a deslindes en las costas del Mediterráneo y aquellas que consideran deslindes en las costas del Atlántico, en cuanto claramente avalan el criterio dual en atención al área geográfica *465 particular. Véanse las sentencias reseñadas en López Feliciano, supra, págs. 465-469.
Puerto Rico, sin embargo, está en una zona tropical en la que el comportamiento del océano Atlántico es muy diferente al de las zonas templadas. Más aún, según los datos ofrecidos en los informes del DRNA, todas las mareas que bañan nuestras costas son también micromareas, toda vez que no exceden, en promedio, de treinta y cinco centímetros, es decir, un pie. Véase Manual de Procedimientos para el Deslinde del Límite Interior Tierra Adentro de los Bienes de Dominio Público Marítimo-Terrestre del DRNA, revisado en septiembre de 2005, pág. 28.(7)
Si el parámetro de medición de la zona marítimoterrestre en España se condicionó a la perceptibilidad de las mareas, dada la naturaleza distinguible de sus dos tipos de costas, lo más consecuente es que en Puerto Rico se utilice un criterio basado en la naturaleza homogénea de nuestras costas, es decir, igualmente adecuado a nuestra realidad. Todo ello nos lleva a la necesidad de respetar las conclusiones del DRNA basadas en su conocimiento especializado. Además, como bien señala la Leda. López Feliciano, el concepto de “marea sensible” es un “concepto jurídico indeterminado” y, por lo tanto, una cuestión técnica o científica. López Feliciano, supra, pág. 470.
Según los datos del mismo DRNA, un setenta y siete por ciento de la población y un cuarenta por ciento de nuestros suelos urbanos se ubican en municipios costeros, en donde se encuentra gran parte de nuestra infraestructura comercial y de servicios. Véase el artículo Retos y riesgos en el manejo de las áreas costeras, de Ernesto L. Díaz, Administrador de Recursos Naturales, en la Revista de aniversario del Programa de Manejo de la Zona Costanera, publicada *466 en junio de 2007.(8) Por ello, la interpretación de la ley y del reglamento no debe hacerse ignorando la vulnerabilidad de las costas, lo expuestas que quedan las comunidades costeras a los riesgos naturales y el deber del Estado de prevenir la pérdida de vidas y propiedades. Interpretar la definición de zona marítimo-terrestre de otra forma sería permitirle al Estado poner en riesgo la seguridad física y económica de todos nuestros ciudadanos.
Las herramientas legales para implementar las estrategias que protegerían al país se integran a través de la buena planificación y de los ejercicios de interpretación a tenor con este deber del Estado. Entre los reglamentos que viabilizan la implementación de la política pública está el Reglamento para el Aprovechamiento, Vigilancia, Conservación y Administración de las Aguas Territoriales, los Terrenos Sumergidos bajo éstas y la Zona Marítimo Terrestre, del DRNA, y los reglamentos de planificación sobre la zonificación de la zona costera y de acceso a las playas y sobre áreas especiales de riesgos a inundación. Estos esfuerzos ofrecen oportunidades para incorporar las consideraciones de protección a las comunidades costeras, vidas, propiedades y los mismos recursos naturales que nos sirven de infraestructura verde para amortiguar la fuerza de los fenómenos naturales que frecuentemente azotan la isla.
Tampoco podemos abstraemos del efecto práctico de deslindar adecuadamente el límite interior tierra adentro de la zona marítimo-terrestre para identificar correctamente las zonas costeras susceptibles a inundaciones.
El Programa Nacional de Seguro contra las Inundaciones (NFIP, por sus siglas en inglés) identifica las áreas susceptibles a inundaciones en todo el territorio de Estados Unidos, e incluye a Puerto Rico. Véase National Flood In *467 surance Act, 42 U.S.C. sec. 4001 et seq.; 44 CFR 64.3. El programa lo administra una agencia adscrita a la Agencia Federal de Manejo de Emergencias (FEMA, por sus siglas en inglés). Las entidades que procuren participar del programa deberán comprometerse con el gobierno federal a regular el uso de sus terrenos inundables. Para ser elegible a participar de las ayudas federales que FEMA administra, en Puerto Rico se promulgó el Reglamento Núm. 13 de Planificación, el cual reglamenta el manejo de estos terrenos susceptibles a inundaciones. Véanse: Boletín Administrativo Núm. OE-2005-79 y la Resolución Núm. JP-RP-13-6-2005 de la Junta de Planificación de 8 de abril de 2005.
Entre la regulación federal aplicable, resalta el Coastal Barrier Resources Act de 1982 (16 U.S.C. sec. 3501 et seq.). Con el fin de reducir la pérdida de vidas, el daño que causa a los recursos naturales y el gasto innecesario de fondos federales, dicha ley retira las ayudas federales a nuevos desarrollos en las áreas que fueran identificadas como “hazardous coastal areas”. En otras palabras, estas áreas designadas como barreras costeras no cualifican para los seguros de inundaciones.(9) Véase 42 U.S.C.A. sec. 5172; 44 CFR, Subcapítulo B, Parte 71, Implementation Of Coastal Barrier Legislation.
Es mi criterio que la política pública ambiental no resiste distinciones al momento de proteger las costas y, consecuentemente, la seguridad pública y la de las comunidades y propiedades privadas costeras, como también el acceso a las playas y la debida preservación, conservación y saneamiento de la zona marítimo-terrestre. Por el asunto de tan alto interés público que hoy atendemos, este Tribunal debe recordar que no debemos realizar nuestra función interpretativa “meramente a través del manejo lógico de conceptos normativos”. Opinión disidente del Juez Asociado Señor Fuster Berlingeri en López y otros v. Porrata y *468 otros, 156 D.P.R. 503, 524 (2002). Aun los textos gramaticalmente más claros se vuelven oscuros con el pasar de los años si no se adecúan a la realidad en la que habrán de operar.
Dicho lo anterior, me parece evidente que no permitir al Secretario del DRNA deslindar nuestros terrenos costeros a base de criterios científicos que verdaderamente salvaguarden nuestra primera línea de defensa contra los fenómenos naturales típicos de nuestro entorno tropical, puede costamos mucho en términos económicos y de vidas humanas. Bajo el claro mandato de nuestra Constitución venimos obligados a interpretar la Ley de Muelles y Puertos de manera que asegure un futuro sustentable a nuestras futuras generaciones. Como la opinión mayoritaria, según mi criterio, no logra esto en toda su extensión, respetuosamente disiento. 1

 Incluso, la facultad de delimitar la zona marítimo-terrestre pertenecía al Secretario del Departamento de Transportación y Obras Públicas. Dicha facultad, así como el estudio y control de inundaciones y el poder de manejar y conservar las playas, fue transferida al Departamento de Recursos Naturales y Ambientales mediante la propia ley habilitadora de dicha agencia. 3 L.P.R.A. sec. 156(c).

 Así, por ejemplo, no hay dunas ni mangles en la parte superior de un acantilado.

 También fue incluido en la Ley de Muelles y Puertos de Puerto Rico, Ley Núm. 59 de 30 de abril de 1928.

 Véanse los estudios oceanógraficos reseñados en D. López Feliciano, Análisis de la definición de “zona marítimo terrestre” en Puerto Rico: Hacia una nueva definición, 42 Rev. Jur. U.I.P.R. 451, 473 (2008). Véase C. Horgué Baena, El deslinde de costas, Madrid, Ed. Tecnos, 1995, pág. 31.

 Aunque cotidianamente utilizamos la palabra “temporal” para referirnos a los fenómenos que abaten nuestras costas tropicales, la realidad es que los temporales que ocurren en el invierno en las costas mediterráneas no son comparables con los nuestros, pues nunca alcanzan las características de los huracanes tropicales. López Feliciano, supra, págs. 471 y 477.

 Incluso en Francia, país que comparte con España el hecho de que sus costas se dividen entre el Mediterráneo y el Atlántico, también se reconocía el flujo y reflujo como norma general para delimitar los terrenos de dominio público, exceptuando las costas mediterráneas, donde las mayores olas en los temporales invernales sería el criterio imperante, perpetuando de esta manera la definición del litus maris del Derecho Justiniano. Horgué Baena, op. cit., pág. 186.

 Para un estudio más detallado sobre esta temática, refiérase a la Ponencia Sobre el Concepto de Marea “Sensible” versus “No Sensible” en la Definición de la Zona Marítimo-Terrestre en Puerto Rico: Una Verdad Inconveniente, presentada por el Prof. Aurelio Mercado Irizarry el 1 de octubre de 2009 en la Segunda Jornada de Derecho Civil Eduardo Vázquez Bote.

 Disponible en:
http://www.drna.gobierno/pr/oficina/arn/recursosvivientes/ costasreservasrefugio/ pmzc/publieaciones/ (última visita en septiembre 2009).

 Además, se prohíbe el uso de fondos federales para la construcción de carreteras o infraestructura dentro de estas zonas. 16 U.S.C.A. sec. 3504.